[No. 42645. En Banc. January 7, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. A. FRANS KOOME, *Appellant*.

*Raymond J. Lee, Stanley E. Stone, P.S.*, and *Roy Lucas*, for appellant.

*Christopher T. Bayley, Prosecuting Attorney*, and *Sharon A. Finegold, Deputy*, for respondent.

*Judith S. Dubester* and *Marjorie Singer,* amici curiae, on behalf of Abortion Action Coalition of Women; *Frederick L. Noland,* amicus curiae, on behalf of American Civil Liberties Union; *William H. Gates,* amicus curiae, on behalf of Planned Parenthood Federation of America, Inc.

UTTER, J.—Appellant, Dr. A. Frans Koome, was charged with performing an abortion on an unmarried minor woman without first obtaining the consent of her parents as required in RCW 9.02.070(a). His sole defense at trial was that the statute, insofar as it gives parents or guardians the unlimited power to overrule their daughter's decision to have a legal abortion, is unconstitutional. The trial court rejected that claim. We reverse.

In July 1972, a young woman, 16 years old, unmarried, pregnant, and for some 18 months a ward of the King County Juvenile Court, petitioned that court for an order allowing her to have an abortion. Her parents and her temporary guardian, Catholic Children's Services, who had refused to consent to the operation, opposed the petition. A hearing was held at which considerable testimony and argument was presented, and after which the court entered the requested order authorizing the abortion.

The parents then petitioned this court for a writ of certiorari reviewing the order, and an immediate stay pending that review. The stay was granted, in effect suspending the consent to the abortion that the Juvenile Court had given, and Dr. Koome was advised of that fact. In spite of the stay, however, he performed the operation on August 15, 1972. For so contravening this court's order, he was subsequently held in contempt. *In re Koome,* 82 Wn.2d 816, 514 P.2d 520 (1973).

Dr. Koome's later criminal conviction for the same act, which is before us in this case, was under RCW 9.02.070, which reads in pertinent part:

A pregnancy of a woman not quick with child and not more than four lunar months after conception may be

lawfully terminated under RCW 9.02.060 through 9.02.090 only: (a) with her prior consent and, if married and residing with her husband or unmarried and under the age of eighteen years, with the prior consent of her husband or legal guardian, respectively, . . .

We hold that this statute too broadly encumbers the right of unmarried minor women to choose to terminate pregnancy, and unjustifiably discriminates between similarly situated groups of women in terms of their right to obtain a legal abortion. In so doing, we follow the unanimous decisions of the two three-judge federal courts and two lower state courts which have reviewed similar statutes. *Coe v. Gerstein*, 376 F. Supp. 695 (S.D. Fla. 1973), *appeal dismissed*, 417 U.S. 279, 41 L. Ed. 2d 68, 94 S. Ct. 2246 (1974); *Doe v. Rampton*, 366 F. Supp. 189 (D. Utah 1973); *Jones v. Smith*, 278 So. 2d 339 (Fla. App. 1973), *cert. denied*, 415 U.S. 958 (1974); *In re P.J.*, 2 Family Planning/Population Reporter 57 (D.C. Super. Ct. Family Div. 1973).

In *Roe v. Wade*, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), and *Doe v. Bolton*, 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973), the United States Supreme Court held that "the Fourteenth Amendment's concept of personal liberty and restrictions upon state action" contains a right of privacy which "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade, supra* at 153. Following a long line of its cases the court characterized this right, like others involving control of one's reproductive functions, as "fundamental." *Roe* at page 155. Cf. *Skinner v. Oklahoma*, 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942); *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); *Eisenstadt v. Baird*, 405 U.S. 438, 453-54, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 39 L. Ed. 2d 52, 94 S. Ct. 791 (1974).

The *Roe* and *Doe* decisions held that state statutes which denied or conditioned the right of adult women to choose abortion were inadequately justified, and consequently vio-

lative of due process. *Roe* at page 164. Those cases did not present the court with the question of the constitutionality of parental and spousal consent requirements such as those of RCW 9.02.070(a). *See Roe v. Wade, supra* at 165 n.67. But they established principles for analysis of state action affecting the right of any woman to terminate an unwanted pregnancy which clearly control our decision in this case. Application of these principles compels the conclusion that the parental consent requirement of RCW 9.02.070(a) unduly infringes upon the right of privacy implicit in the fourteenth amendment to the Constitution of the United States and article 1, section 3 of the Washington State Constitution.

 Prima facie, the constitutional rights of minors, including the right of privacy, are coextensive with those of adults. Where minors' rights have been held subject to curtailment by the state in excess of that permissible in the case of adults it has been because some peculiar state interest existed in the regulation and protection of children, not because the rights themselves are of some inferior kind. *Prince v. Massachusetts*, 321 U.S. 158, 168-70, 88 L. Ed. 645, 64 S. Ct. 438 (1944); *Ginsberg v. New York*, 390 U.S. 629, 638, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968). In some other cases minors' rights have been differentiated from those of adults because of a fundamental difference in the nature of the particular state interaction with juveniles. *McKeiver v. Pennsylvania*, 403 U.S. 528, 547-50, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971); *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957); *Estes v. Hopp*, 73 Wn.2d 263, 438 P.2d 205 (1968).

Several courts have upheld minors' privacy rights where no such special context or state interest existed. *E.g., Breen v. Kahl*, 419 F.2d 1034 (7th Cir. 1969), *cert. denied*, 398 U.S. 937 (1970); *Coe v. Gerstein, supra; Doe v. Rampton, supra* at 202-03; *Merriken v. Cressman*, 364 F. Supp. 913 (E.D. Pa. 1973). Recognition of the equal status of the rights of minors seems particularly necessary with regard to the privacy rights involved here. In *Roe*, at page 153, Justice

Blackmun emphasized that the right to terminate pregnancy was made vital in part by the potential dangers and difficulties of childbearing:

> The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved.

Virtually every one of these problems and risks is magnified where the pregnant woman is underage. *See* Note, *The Minors' Right to Abortion and the Requirement of Parental Consent*, 60 Va. L. Rev. 305, 307-08 (1974); Pilpel, *Minors' Rights to Medical Care*, 36 Albany L. Rev. 462-63 (1972), and authorities cited therein.

> We do not learn from the opinion in Roe v. Wade, *supra*, the age of plaintiff Roe, the pregnant woman who enjoyed the "fundamental", *"personal* right of privacy" . . . recognized by the Supreme Court. But we do know that a pregnant woman under 18 years of age cannot, under the law, be distinguished from one over 18 years of age in reference to "fundamental", *"personal"*, constitutional rights.

*Coe v. Gerstein, supra* at 698.

█ Subjection of a minor woman's decision to terminate an unwanted pregnancy to absolute and potentially arbitrary parental veto clearly constitutes a substantial burden on her rights similar to those held unconstitutional in *Roe* and *Doe*. The State argues, however, that the impact of the consent requirement is mitigated by the possibility of juvenile court intervention under RCW 13.04.010 (12) in cases of parental caprice. The availability of such relief is

problematical at best. The consent requirement is only effective where the abortion is not necessary to preserve the mother's life, and it is not established that jurisdiction will lie under RCW 13.04.010(12) absent such exigent circumstances. Under similar provisions it has been held that absent imminent danger to the minor's life, courts should not so intervene. *In re Hudson*, 13 Wn.2d 673, 126 P.2d 765 (1942); *In re Green*, 448 Pa. 338, 292 A.2d 387 (1972).

Even if juvenile court intervention were established and automatic, the delays and costs inherent in litigation themselves would comprise an unworkable burden. Minor women unwilling to add litigation against their parents to their already acute personal difficulties would gain little from the possibility of court intervention. And even those who were sufficiently determined to go to court would find the costs of publicity, delay and anxiety substantial. Hearings imposing just such costs were held impermissible in *Doe v. Bolton, supra* at 197-99. *See also Doe v. Rampton, supra* at 203.

The question then becomes whether the statute's abridgment of fundamental rights is justified by some "compelling state interest" which it furthers. If it is not its impact constitutes a violation of due process. *Roe v. Wade, supra* at 155, 164; *Coe v. Gerstein, supra* at 697. *Roe* and *Doe* make clear that, at least during the first trimester of pregnancy, state interests in maternal health or the protection of the fetus are inadequate to justify interference with the pregnant woman's right to consult with her doctor and decide herself whether or not to continue her pregnancy to term. *Roe v. Wade, supra* at 156-65. Thus, the restrictions on that decision provided by the statute before us here can only be sustained if some additional state interest is present in the case of unmarried minor women which will justify them. The State argues that two such purposes are furthered by the requirement of parental consent: the assurance of an adequately reflective and informed decision on the part of

the minor woman, and the "support of the family unit and parental authority."

The contention that the statute can be justified as supportive of parental authority as an end in itself is not urged strongly by the State, and cannot be sustained. Although the family structure is a fundamental institution of our society, and parental prerogatives are entitled to considerable legal deference (*Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972)), they are not absolute and must yield to fundamental rights of the child or important interests of the State. *Prince v. Massachusetts* 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944); *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 741, 25 L. Ed. 2d 736, 90 S. Ct. 1484 (1970) (Brennan, J., concurring); *Wisconsin v. Yoder*, 406 U.S. 205, 243-46, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) (Douglas, J., dissenting in part); *In re Palmer*, 81 Wn.2d 604, 503 P.2d 464 (1972).

In the circumstances envisioned by this statute, there seems to be little parental control left for the State to help salvage: An unmarried minor has become pregnant, and her determination to get an abortion is unalterably opposed by her parents. Reestablishment of parental control by resort to the pure force of the criminal law seems both futile and manifestly unwise in such a situation. Moreover, it should be recognized that considerations of the rights of parents in raising children do not argue solely for the implementation of the pregnant minor woman's parents' will. She herself is on the verge of becoming a mother, and if she bears the child she will be entitled to its custody and control. RCW 26.28.110. The decision to continue or terminate her pregnancy is, in effect, her first "parental" decision. It should not arbitrarily be subordinated to her parents' last.

Nor does the asserted state interest in ensuring that the decision to complete or terminate a pregnancy be informed justify the decisive impact of this statute on the minor woman's rights. It is true that the gravity of the abortion decision is such that information and reflection are vital to

its making. The need for such qualities of decisionmaking may even be considered "compelling." Intelligence, however, is not what the statute here requires. The statute requires parental consent, and allows parents to refuse to consent not only where their judgment is better informed and considered than that of their daughter, but also where it is colored by personal religious belief, whim, or even hostility to her best interests.

This case graphically demonstrates that the reasons for refusing consent may be ill-advised or otherwise improper. The father of the minor woman testified that his opposition to the abortion stemmed from his belief that continuing her pregnancy to term would deter her from becoming pregnant in the future. In *Eisenstadt v. Baird*, 405 U.S. 438, 448, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972), the Supreme Court indicated that a similar rationale for an anti-contraception statute would be wholly irrational. Her guardian, Catholic Children's Services, opposed the abortion on religious grounds. That the legal imposition of such religious mores on a child is constitutionally impermissible is beyond question. *Wisconsin v. Yoder, supra* at 243-46 (Douglas, J., dissenting in part); *Engel v. Vitale*, 370 U.S. 421, 8 L. Ed. 2d 601, 82 S. Ct. 1261, 86 A.L.R.2d 1285 (1962).

As the court held in *Coe v. Gerstein*, 376 F. Supp. 695, 698 (S. D. Fla. 1973), *appeal dismissed*, 417 U.S. 279, 41 L. Ed. 2d 68, 94 S. Ct. 2246 (1974), the state cannot constitutionally require consent where it gives the parent or guardian "the authority to withhold consent for abortions for any reason or no reason at all." *Coe* at page 698. The "conclusive presumption" that the parents' judgment is better than the pregnant woman's cannot withstand constitutional scrutiny. *Stanley v. Illinois, supra; Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 39 L. Ed. 2d 52, 94 S. Ct. 791 (1974).

State restrictions on fundamental freedoms must be narrowly drawn to conform to the legitimate state interests to be furthered, and must not sweep too broadly over the

exercise of privacy rights. *Griswold v. Connecticut*, 381 U.S. 479, 485, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965); *Roe v. Wade*, 410 U.S. 113, 155, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). The statute here provides a parental veto power where less restrictive means are available which can as well insure adequacy of reflection and consideration in a minor's abortion decision. The physician-patient consultation which should precede *any* abortion, *see Proceedings of the AMA House of Delegates* 220 (June 1970), provides information, advice as to alternatives, and time for deliberation. If professional responsibility is not safeguard enough, the common law requires that physicians determine that a minor's decision to consent to any form of medical care, including abortion, is adequately informed and considered, and civil liability is available to enforce this injunction. *Smith v. Seibly*, 72 Wn.2d 16, 17, 21, 431 P.2d 719 (1967). Whatever additional guaranty of the "quality" of the abortion decision is necessary may be provided by other less drastic state requirements. If parental supervision is considered valuable in itself, perhaps the State could make a certificate of parental *consultation* prerequisite to a minor's abortion. A demand for parental *consent*, backed by the power of the criminal law of the state, is not necessary and cannot be constitutionally justified.

> Certainly . . . parents ought to advise and guide their unmarried, minor daughters in a decision of such import. But a state which has no power to regulate abortions in certain areas simply cannot constitutionally grant power to . . . parents to regulate in those areas. Therefore . . . parents cannot look to the state to prosecute and punish the physician (or other participants) who performs an abortion against the wishes of the . . . parents.

*Coe v. Gerstein, supra* at 699.

Thus we find the State's interests in restricting minors' access to abortions inadequate to satisfy the requirements of due process under *Roe* and *Doe*. In addition, we hold that the distinctions drawn between different classes of

pregnant women in the parental consent provision of RCW 9.02.070(a) violate the equal protection clause of the Fourteenth Amendment and the related principles of article 1, section 12 of our state constitution.

The equal protection clause parallels the due process demand for adequate justification of state abridgement of fundamental rights. *Jackson v. Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972); *Stanley v. Illinois, supra* at 658. It also imposes the further requirement that classifications impacting on personal liberties be drawn narrowly and in conformance with the state purposes they are intended to serve. Legislative distinctions in protected areas must be carefully " 'tailored' to achieve the articulated state goal." *Dunn v. Blumstein,* 405 U.S. 330, 357, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972); *Eisenstadt v. Baird, supra* at 450-51; Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 26-30 (1972), and cases there cited. RCW 9.02.070 requires parental consent only for the performance of abortions on unmarried minor women. By so doing, the statute, in the context of other relevant provisions and doctrines of our State's law, makes three discriminations: (1) between unmarried adult women seeking abortions and similarly situated minors; (2) between married and unmarried minors; and (3) between unmarried minors seeking abortions, and others seeking other types of medical care. None of these legal lines traces the contours of the asserted state justifications closely enough to withstand equal protection scrutiny.

The distinction between unmarried pregnant women under 18 and those over the age of majority corresponds at best roughly to the state's interests in parental authority and reflective decisionmaking. Parental authority wanes gradually as a child matures; it does not suddenly disappear at adulthood. Similarly, the ability to competently make an important decision, such as that to have an abortion, develops slowly and at different rates in different

individuals. Both law and science have realized that children below voting age are capable of making many important decisions. *See Wisconsin v. Yoder*, 406 U.S. 205, 245 n.3, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) (Douglas, J., dissenting in part) and authorities there cited. This State has recognized this fact in both its statutory and common law regarding competence to consent to medical treatment. *See, e.g.,* RCW 69.54.060 (treatment for drug abuse); RCW 70.24.110 (treatment for venereal disease); *Smith v. Seibly,* 72 Wn.2d 16, 431 P.2d 719 (1967) (permanent sterilization). While RCW 26.28.015(5) expressly grants to 18-year-olds the right to, *inter alia,* make decisions regarding medical treatment, neither it nor any other provision of our law either states or implies that persons under 18 do *not* have that right or the capacity to exercise it, other than, of course, the statute before us.

The fact that personal abilities and mental faculties develop gradually does not mean that the State cannot create age limits which do not perfectly correspond with the capacity of minors to act as adults, however. In many areas the State has a strong interest in restricting the activities of infants unable to exercise mature judgment, a subjective inquiry into the maturity of each individual minor is a practical impossibility, and any flat age limit is necessarily arbitrary. *Cf. Oregon v. Mitchell,* 400 U.S. 112, 142, 27 L. Ed. 2d 272, 91 S. Ct. 260 (1970) (Douglas, J.); *Seattle v. Pullman,* 82 Wn.2d 794, 810, 514 P.2d 1059 (1973) (Hunter, J., dissenting). In such circumstances imprecision in age classifications may be permissible, perhaps even where important rights are affected, because it is inevitable. In the case of the capacity to consent to abortion, however, these reasons for setting arbitrary age requirements are not present. The age of fertility provides a practical minimum age requirement for consent to abortion, reducing the need for a legal one. *Ballard v. Anderson,* 4 Cal. 3d 873, 883, 484 P.2d 1345, 95 Cal. Rptr. 1 (1971). The common law requires that a physician subjectively evaluate the capacity of a minor to

give informed and meaningful consent to any type of medical care. *Smith v. Seibly, supra* at 17, 21. Thus, the State's interest in supporting parental authority and enhancing the quality of personal judgment is largely safeguarded by classifications created by nature and common law. The marginal benefits which may be produced by the broader and less precisely-drawn statutory line cannot justify the substantial infringement on privacy rights it entails.

The statutory differentiation between pregnant minor women on the basis of their marital status similarly bears little relation to the asserted reasons for imposing the parental consent requirement. Parental authority may, in some families, remain strong after marriage, and in others disappear long before it. The main effect of this classification on the minor woman's relations with her family would, in any event, seem to be negative: the law encourages pregnant minors, whose parents withhold consent, to marry solely in order to then terminate an unwanted pregnancy. The statutory language would, in addition, seem to impose the parental consent requirement on minor women whose marriages have been dissolved; the State's interest in upholding parental control over such women is tenuous at best. Nor does this classification correspond to the need for adult guidance to insure informed and considered decisionmaking. Married minors are not necessarily more mature and responsible than their unmarried contemporaries. Yet the statute does not require a married woman to obtain the consent of her parents or any other adult.

In *Eisenstadt v. Baird*, 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972), a Massachusetts law which made it a crime to provide contraceptives to unmarried persons was struck down as violative of the equal protection clause. The court held that the state's justifications for restricting the availability of contraceptives were applicable equally to married and unmarried persons. Consequently, the distinction based on marital status could not meet even the minimum standard of rationality applicable in the absence of a

burden on fundamental rights. *Eisenstadt v. Baird, supra* at 447 n.7. Here, where the right affected is clearly to be treated as fundamental, a similar distinction no more persuasively justified cannot stand.

Nor does the third statutory discrimination, between minors seeking abortions and those seeking other types of medical care, adequately conform to the interests the State has put forth. Abortion during early pregnancy is, after *Roe*, to be treated as a purely medical procedure, and "the abortion decision in all its aspects is inherently, and primarily, a medical decision." *Roe v. Wade*, 410 U.S. 113, 166, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). Yet the restrictions imposed by the parental consent requirement of RCW 9.02.070, and the consequences of its transgression, bear no resemblance whatsoever to the legal treatment of other types of medical decisions by minors.

A doctor competently performing any other type of surgery on a consenting minor runs virtually no risk of even civil liability because of the absence of parental consent. *See* Pilpel, *Minors' Rights to Medical Care*, 36 Albany L. Rev. 462, 466 (1972). A doctor similarly performing an abortion chances criminal conviction. There is no inherent difference between these different forms of serious medical treatment in terms of the need for parental control or informed and intelligent choice which can explain or justify this gross distinction. The law of this state is that a minor's competence to consent to irreversible sterilization is to be determined on the facts of each case. *Smith v. Seibly, supra.* Some of the factors recognized as important in determining competence in *Smith*, at page 21, were "age, intelligence, maturity, training, experience, economic independence or lack thereof, general conduct as an adult and freedom from the control of parents . . ." An unmarried minor with all these attributes is still denied the right to decide for herself whether or not to bear a child she has conceived. In the context of *Roe*, the differential treatment of these two forms of birth control is tantamount to dis-

crimination on the basis of the exercise of a fundamental right. As such it cannot stand. *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969).

For these reasons we find that the parental consent requirement of RCW 9.02.070(a) violates the due process principles of *Roe* and *Doe* and the requirements of the equal protection clause. By so holding, however, we do not rule that the State cannot in any way regulate the performance of abortions on minors. The interests put forth by the State for doing so are not without weight. A statutory scheme which protected them without sacrificing the privacy rights of pregnant minor women could pass constitutional muster. A requirement of consultation with parents or others able to advise would seem arguably permissible, as we have noted. Even a law allowing parents to stop an abortion where they can show that their daughter is not acting or capable of acting in her own best interests might be sustainable. But the present statute, which forces a woman who may have made her decision maturely and intelligently to resort to trying and possibly prolonged court action at best, or submit to an arbitrary and absolute veto at worst, cannot be upheld.

The decision of the trial court is reversed.

HALE, C.J., and ROSELLINI and BRACHTENBACH, JJ., concur.

FINLEY, J. (concurring)—I reach the same result as the majority opinion regarding the constitutional infirmities of the present statute. However, I am impelled to comment separately on several aspects of this case.

First, a review of the circumstances that brought this case before this court: The Juvenile Court had jurisdiction of the minor because she had previously been made a ward of the court pursuant to RCW 13.04. The minor petitioned for an order to allow an abortion without parental consent and, after a hearing, the Juvenile Court determined that an abortion would be in her best interests and entered an

order accordingly. However, the order entered by the Juvenile Court permitting the abortion was subsequently stayed by the Chief Justice pending review by this court. A hearing on the stay order was scheduled to take place promptly in a matter of days. Perhaps because of concern for the length of time that could be consumed by the appellate process, but probably because of other personal reasons or convictions, defendant Dr. Koome performed the abortion before this court could hold a hearing to review the stay order of the Chief Justice and the order of the Juvenile Court.

Thus, but for the Chief Justice's stay order, the abortion would have been legal and this case would not be here. Moreover, the facts strongly indicate that the denial of parental consent essentially was for punitive and irrational reasons. Thus, if this court had heard the matter, it is highly dubious that we could have found a manifest abuse of discretion by the Juvenile Court and that we would have overturned its decision consenting to the abortion.

Consequently, the result reached by the majority is consistent with what would have occurred if this court had not originally entertained the matter via issuance of the stay order. If appellate courts are to review such cases, it is imperative that the procedure must be a viable and expeditious one to ensure that a final appellate decision will be rendered before the right to an abortion becomes a practical impossibility. Minors cannot be deprived of such rights without a meaningful opportunity to be heard. *Cf. Armstrong v. Manzo*, 380 U.S. 545, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965).

Second, the precise effect of the court's holding in this case is to declare unconstitutional only that part of RCW 9.02.070(a) which requires parental consent prior to terminating a pregnancy of an unmarried female under the age of 18 years. RCW 9.02.070(b), which requires residency by the female for 90 days prior to termination of the pregnancy, and RCW 9.02.070(c), which requires that the abor-

tion be performed only in a hospital accredited by the Joint Commission on Accreditation of Hospitals or at a medical facility approved by the State Board of Health, are not affected by the court's decision.

Next, the majority suggests that a statute could be drafted that could withstand constitutional attack. I agree and think that this aspect of the case deserves some further elaboration. The validity of such legislation would depend, I think, upon two factors: (1) the nature of the reasons asserted for preventing an abortion; and (2) the procedural protections afforded to minors.

Considering the principles of constitutional law emphasized in the majority opinion, it now seems rather clear that only certain narrowly defined reasons can be asserted to justify restricting a minor's right of privacy concerning an abortion. The asserted reasons or justification for preventing an abortion must be sound and rational and be convincingly in the best interests of the minor. Elaborating further in this regard, it appears to me there could be two such reasons: (1) the existence of a physical ailment making an abortion more dangerous than childbirth; or (2) a greater probability of *serious* emotional instability resulting to the *particular* minor from an abortion than from childbirth.

To withstand constitutional attack, it would also be necessary in my judgment that future legislation contain procedural provisions, not unduly burdensome upon the minor, to assure that an abortion is to be prevented only for the above described legitimate reasons.

The present statute is fatally deficient in failing to provide such assurances. In a few isolated situations, a minor *may* be able to petition the juvenile court and be declared a ward of the court pursuant to RCW 13.04 if she believes that her parents are unreasonably and unlawfully withholding consent to an abortion. The juvenile court could, under appropriate circumstances, then consent to an abortion. But there is little or no assurance that the jurisdiction

of the juvenile court could be so invoked in all or even most cases in which parents would unjustifiably refuse to consent to an abortion. When the jurisdiction of the juvenile court cannot be invoked, there remains no expeditious and viable means of redress for a minor.

What is needed is a procedure which assures access to the judicial system for a determination of whether legally justifiable reasons exist to prevent a minor from having an abortion. Whatever process is devised, it should not be so cumbersome and onerous as to preclude the minor—for pecuniary or other reasons—from having access to that process.

One viable possibility, not unreasonably onerous to the minor but still compatible with the accomplishment of legitimate state interests, would be to require each physician who is requested to perform an abortion upon a minor to promptly notify the juvenile court and the parents or guardian of the minor. Then an opportunity could be afforded by law for the *parents* to petition the juvenile court for a hearing. If they assume the burden of proof and demonstrate either (1) that the minor suffers from a physical ailment that makes an abortion more dangerous than childbirth, or (2) that serious emotional instability would more likely be caused by the abortion than by childbirth, then I believe a state statute could legitimately prevent the abortion.

The procedure suggested would constitute a reasonable balancing of interests and would meet what I perceive to be a constitutional requirement, as I read *Roe v. Wade*, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), and *Doe v. Bolton*, 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973), that state legislation *ensure* that only *legitimate state interests* may be employed to *prevent an abortion*.

Since the present statute does not provide the indicated assurances, I concur with the majority.

STAFFORD, J. (dissenting)—Prior to November of 1970, an unmarried pregnant teenager had only limited options available to her. For example, she could marry the natural father; she could continue her pregnancy to term and either keep the child or place it for adoption; or, she could obtain an illegal abortion, probably performed under conditions dangerous to her health. In November 1970, Referendum No. 20 was ratified. Under its terms a physician may lawfully terminate a woman's pregnancy, with her prior consent, not more than 4 lunar months after conception. If, however, the woman is under 18 years of age, the prior consent of her legal guardian is required. Defendant contends that consent of a female minor's legal guardian prior to abortion is an unconstitutional abridgment of her fundamental right of privacy in access to abortion. I do not agree.

In January 1973, the United States Supreme Court decided *Roe v. Wade*, 410 U.S. 113, 164, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973) and *Doe v. Bolton*, 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973). As far as pertinent here, they held that "[f]or the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." While it is true that footnote 67 in *Roe* states the court did not decide the constitutionality of a provision requiring consent for a minor's abortion, one cannot dismiss the impact of *Roe* and *Doe*. Actually the decisions provide valuable guidelines for an analysis of the question before us.

Simply stated, at page 152, *Roe* took the following approach: (1) "a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the constitution"; (2) at page 153 the *Roe* court stated: "This right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy"; (3) regulations limiting a woman's fundamental right to privacy in having an abortion may be justified only by a " 'compelling state interest,' " *Roe* at 155; (4) the compel-

ling point with respect to the state's interest in the mother's health "in the light of present medical knowledge, is at approximately the end of the first trimester" (at 163); (5) the compelling point with respect to the state's interest in the potential life of the fetus is at viability, *Roe* at 163; (6) "for the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." *Roe* at 163.

With this outline in mind, our first step is to determine whether the right of privacy guaranteed by the constitution is one enjoyed equally by minors. Although the Supreme Court has been less than precise in search of a basis for an individual's "right of privacy," the majority in *Roe*, at page 153, indicates that this right is "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action." Since neither the Fourteenth Amendment nor the Bill of Rights is for adults alone, I would find that a minor has the same right to privacy as does an adult. *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967); *see also Levy v. Louisiana*, 391 U.S. 68, 20 L. Ed. 2d 436, 88 S. Ct. 1509 (1968); *Tinker v. Des Moines Ind. Community School Dist.*, 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969). It would also appear that the minor's right of privacy is broad enough to encompass a minor's decision whether to terminate her pregnancy. *Roe* at 155. This right, however, is not absolute. It is subject to some limitation when the state's interest in the protection of health, prenatal life and medical standards touching the same become dominant. *Roe* at 155.

Since we are dealing with statutory limitation of a fundamental right, the limitation may be justified only by a compelling state interest. While in *Roe* the court found the interest of the state in the health of a pregnant adult did not reach the compelling state interest stage until the end of the first trimester, I would find that when the mother is

a minor the State's interest is compelling from the moment of conception. This is not because the mortality rates for minors undergoing early abortions are necessarily higher than those of adults, but because the State is justifiably concerned both with the mental health of the minor and with the fact that the decision to have an abortion should be an objective and informed one.

In this state, as in most, minors are not permitted to participate in some activities authorized for adults. A list of statutes providing for a difference in such events would unnecessarily lengthen this opinion. Nevertheless, they clearly illustrate that legislatures have regularly set minors apart for special consideration in the restriction of their activities. Further, courts have just as regularly recognized the validity of those special classifications. *George v. United States*, 196 F.2d 445 (9th Cir. 1952). As the United States Supreme Court said in *Prince v. Massachusetts*, 321 U.S. 158, 168, 88 L. Ed. 645, 64 S. Ct. 438 (1944), "the mere fact a state could not wholly prohibit this form of adult activity . . . does not mean it cannot do so for children." In *Ginsberg v. New York*, 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968), the Supreme Court again recognized that the power of the state to regulate the activities of children is greater than its control over similar conduct by adults. Although *Ginsberg* did not involve the state's invasion of a minor's constitutionally protected freedoms, the court recognized that such freedoms could be curtailed by the state when similar freedoms enjoyed by an adult could not.

One reason for this distinction is the realization that minors are not equipped mentally or emotionally to cope with many of the major decisions that may confront them. *Harrigfeld v. District Court*, 95 Idaho 540, 511 P.2d 822 (1973); *see generally* 42 Am. Jur. 2d *Infants* § 1 (1969). I see this as the primary justification for the requirement of consent by a legal guardian imposed by RCW 9.02.070.

It is important to note that the statute does not contain a "parental veto clause," as it is characterized by appellant. The statute requires "the prior consent of her . . . legal guardian." A parent's refusal to an abortion would not necessarily foreclose that minor's ability to obtain one. Resort to the protective facilities of the juvenile court is always available. Should that court find the parent's refusal to consent constituted gross and willful neglect of medical care necessary for the minor's well-being, it could declare the minor a dependent child, under RCW 13.04.010, and authorize the abortion, if it found this to be in the best interests of the child.[1]

I also feel that the statute in question reflects the interest of the state, not in the actual decision whether to terminate a pregnancy, but in the quality of that decision (which of course includes the availability of objective interested advice) and the manner of its implementation and its execution. The ramifications of a decision to terminate a pregnancy by abortion do not end with the abortion. Legal abortions, as provided by our statute, are still relatively new in our society. The psychiatric aspects of abortion as compared with a pregnancy carried to term by a minor female are inconclusive because the medical authorities are not in agreement. For example, one study recommends that patients age nine to twenty who undergo abortions need a systematic 5-year follow-up.[2]

I feel that the interest of the state in the quality of the minor's abortion decision as well as in the mental health of a pregnant minor is of a compelling nature from the time of conception and justifies the State's infringement on a minor's right of privacy.

HUNTER, HAMILTON, and WRIGHT, JJ., concur with STAFFORD, J.

---

[1]It is unnecessary, at this time, to discuss the constitutional problems implicit in a decision by parents to refuse authorization for an abortion solely on religious grounds. The issue is not before us and must be reserved for the future.

[2]A. Gallattee, M.D., *Psychiatric Aspects of Abortion,* 64 J.N.M.A. 308 (1972).